And I'll call the next case, it's U.S. v. Balwani. When you're ready, Counsel. Good morning, Your Honors. I'm Jeff Cooper Smith and I represent Sonny Balwani, and may it please the Court. As the Court has seen from our briefing, there are three issues that require reversal in this case. I want to start with constructive amendment to the indictment. As this Court knows, constructive amendment always requires reversal, always requires reversal. So the question here is, was there a constructive amendment? The paramount issue, and this is a quote from Ms. Volker just now in the Holmes argument, the paramount misrepresentation was the accuracy of the device. That's what Government Counsel said, and that's true. What's hanging in the air of this courtroom, what was at trial, and the whole Theranos story, the narrative told by the Government, was all about, did Theranos have a device, and did they know it didn't work? It's not about conventional technology. And when you look at the indictment, you can start with paragraph 22, and this is in the record of the indictments at ER-6886. The indictment starts out by talking about the Theranos technology and the Theranos device. When you get to paragraph 22, which is the operative charging language for the conspiracy against patients, at lines 25 through 26, the specific way that the defendant misrepresented things is because he knew that the Theranos technology was not capable of producing reliable and accurate results. That's the Theranos case. What happened here, and it goes on, paragraph 16, paragraph 17C, the bill in particular, it's all about Theranos technology. What happened here is the Government put on extremely powerful, impactful, crucial evidence from a CMS regulator, not just any witness, but a Government regulator, Sarah Bennett, who testified about the immediate jeopardy, which was defined at trial as creating a risk of death or serious bodily injury. It does not get any worse than that. That testimony, however... Was that not true, though? Was that not true? Your Honor, the CMS, it is true that CMS found an immediate jeopardy. The immediate jeopardy they found related only to commercial, conventional technology that's being used by every lab in the country and probably the world, not the Theranos device. The main issue that drove the immediate jeopardy finding was regarding a blood test called PTINR, which is a blood thinner type test, and that finding related to some problems in the lab with the commercial technology being used to test patients on this PTINR asset. And did CMS know whether that was Theranos technology or not at the time? They absolutely did, Your Honor. In fact, the witness, Ms. Bennett, had not even inspected the part of the Theranos lab that dealt with the proprietary technology, that used the proprietary technology. She was all about the commercial technology. That's the witness that the Government presented. The witness who could testify that the commercial technology was inaccurate and unreliable according to their report. And that, under the Sterone case, which is a seminal case about constructive amendment, is a constructive amendment because we now have crucial facts, complex facts in the words of the case law, that amend the indictment. And I think there could be no clearer case of that. Can I ask about, it's an interesting argument, pretty smart argument, de novo review, right? Thank you, Your Honor. Good to get us on that base. The problem I see with it is that the facts in the indictment don't just relate to Theranos-related proprietary information. So I don't understand, at the end of the day, doesn't this boil down to, did you have noticed that other third-party testing would be used? And I'm not sure why the indictment wouldn't have put Mr. Balwani on notice that that was going to happen because of the statements in the indictment. Thank you, Your Honor. The indictment is absolutely not about conventional technology. I understand the Government now, and after the fact, pulls out snippets where it talks about Theranos testing, and they try to argue that that is a much broader principle that includes the commercial technology. But I think you need to look no further than what the Government and the District Court actually believed at the time of, right before the trial. So in our opening brief, Your Honor, at page, I believe it's at page 12, I'm sorry, at page 14 through 15. Your argument is that the Government didn't, they believed this all did happen on Theranos. Right. Yes, Your Honor. So the Government took the position in the motion in limine stage of trial that Mr. Balwani should not be able to introduce the fact that his mother was tested on Theranos at Theranos's lab because we couldn't show, the defense couldn't show, that it was on proprietary technology. They said it was irrelevant to the case because it's not part of the indictment. And then the District Court, Your Honor, and this is at 6082 of the record, said this client, your client is not charged with doing anything with commercial machines. It's about the company's machines, like they said in the indictment. So both the District Court. But the indictment, counsel, said Holmes and Balwani represented to investors that Theranos conducted patient testing using Theranos manufactured analyzers, when in truth, they knew that Theranos purchased and used for patient testing third-party commercially available analyzers. So that's the whole theory, is that you're basically, the defendants are telling everybody that there's this proprietary technology that works better than conventional machinery, but in fact they're using third-party commercially available analyzers. And so that's right there in the indictment, that allegation. So why doesn't that provide sufficient notice? I know it's a big, sprawling, complex case. So you're right, the District Court did say that this was an extensive trial. But you're talking about constructive amendment of the indictment. So when I look at the indictment and I see this allegation along with multiple references to blood testing services, doesn't that defeat the argument here? Thank you, Your Honor. It does not. And the reason is because that particular allegation has to do with alleged representations to investors that Theranos wasn't actually using conventional technology. That's a different point than, like, does the proprietary technology work or is the indictment about whether commercial technology works or not? The government at trial was not questioning whether the commercial technology worked. On the contrary, they held up commercial technology as the gold standard that was actually the whereas the Theranos technology, according to the government, was not accurate and reliable. So that point is about a misrepresentation to investors about what devices the company is using. It has nothing to do with the accuracy and reliability point. And Your Honor, I think that there are occasional references in the indictment to Theranos testing. But when you read the indictment fairly, and frankly, when you read the bill in particular as fairly, SCR 201, it is all about Theranos technology. And I want to just point to paragraph 16, for example. Paragraph 16 of the indictment says that Theranos represented that they had accurate, fast, reliable blood tests. But then when it gets to, well, why is that false? Why is that false? It's because, according to the indictment, the defendant knew that the proprietary technology didn't work. And that is exactly the two cases we cited in the brief, the Crocker case from the Third Circuit and the Hoover case from the Fifth Circuit. Both of those courts held that when the indictment alleges the manner in which the false statement is false, why it's false, and the government proves something else, that's a constructive amendment. And, you know, the case law... But the problem with the Hoover case is, I read the Hoover case to hinge more on the jury instructions. That's where the problem came in, that the jury instructions in the Fifth Circuit's view seemed to go beyond the indictment. I don't see the same thing here. Now, maybe you'll argue that's a distinction without a difference, but that does seem to be different than what we're dealing with here. Your Honor, there are certainly cases, and I think you're correct, the Hoover case I believe is one, where constructive amendment can be accomplished by jury instructions that amend the indictment. But the Sterone case, the basic elements, it can also be established by a complex of facts, by evidence introduced. And, of course, the main case on that is the Sterone case itself, where the government's indictment charged the defendant had interfered with commerce by interfering with the shipments of sand into the state of Pennsylvania. And then on a trial, they proved that, but they also proved that the interference with commerce was accomplished by interfering with steel being shipped out of the state of Pennsylvania. And because a general verdict form, just like this case, you can't tell what the jury decided, and the standard is even more favorable than Brady, it's could the jury have reached a different conclusion. It's a more favorable standard than even Brady requires. What's going on here, Your Honor, is that the introduction of this highly impactful, powerful evidence in the form of a CMS report, and also two out of the four patients, a government called four patients in this case, two of the four were conventional technology patients, patient ET and patient BB. So this is all about amending the indictment with this complex of facts. It seems like it might be a variance from the indictment, but amendment seems a bit of a stretch. And the reason I think that, and I'll allow you to push back on this, is that the whole, it seemed to me that the evidence at trial was Theranos at some point became aware that its own proprietary technology wasn't working correctly, and so they tried to backfill that with third party technology. I guess under the theory that, you know, as theirs got better, they'd be able to transition it all to Theranos technology. It seems odd to say that when you're using this third party technology and holding it out as your own, which was happening, that you wouldn't assume that that would come into play in the defense. Your Honor, at trial, the government held the conventional technology up as the gold standard. There was really no evidence that that was the case, and in fact, as I said, the government admitted the indictment was about proprietary technology until they wanted to introduce this immediate jeopardy. And Your Honor, in terms of variance, which was your original point of your question, I think, the cases the government cites on variance, like the Feldman case and the Kakar case, even Adamson, which found a fatal variance, these were trivial differences. In the Feldman case, for example, the charge was forgery, and the indictment said forgery, and then actually the evidence was the defendant guided intoxicated people's hands to create signatures. These were trivial differences. I think a better example, Your Honor, is the U.S. v. Dipentino case from this court in 2001, which was, by the way, a plain error case. And there the court found a constructive amendment because the defendant was charged with some asbestos-related violations, and the indictment said the problem, the defendant, what he did wrong was he should have put the asbestos into specialized containers on the site. But then at trial, they proved that, well, actually, the problem was he should have gone and dumped it, you know, in a safe way off-site. And that was a constructive amendment. The same with the Schiffsee case, which Judge Schroeder authored. The Schiffsee case was about pension plan funds. The indictment said that the way that the theft from the pension plan was accomplished was through fraud. The government proved at trial that it was just by basically stealing without making misrepresentations. That was a constructive amendment. What we have here is, under the words of the Hartz case, this court's case in 2006, this is completely different behavior. That's the standard from Hartz. On the one hand, we have what everyone, I think, thought this case was about, apparently even the government, that this case is about misrepresentations, that the proprietary technology was great and actually didn't work. But then, in fact, they prove that, you know, there's this danger to life and safety because of conventional technology. And that is totally different behavior. Are we running a bad lab? Is that this case? Or is it misrepresentations about proprietary technology? The Theranos case is about misreps about proprietary technology. That's what this case is. I think a fair reading of the indictment, going through paragraphs, especially 16, 17c, the operative charging language in 22, even the opening, is all about proprietary technology. And that's what this defendant, my client, Mr. Balwani, supposedly did wrong. The government moved the goalposts, switched gears, because they love the idea, it appears, of immediate jeopardy and danger to health. Problem was, had nothing to do with Theranos. Had to do with Siemens machines that were being run by every single lab. In the time I have, Your Honor, I'd like to pivot briefly to the NAPU issue. This is the issue where the government put on evidence through witness testimony, especially Mr. Tolbert, that Theranos, especially Ms. Holmes, had said that Theranos was actively using its device on the battlefield with the military. And then what the government did there was they, I counted, 15 times at closing where they made this a major theme of their closing, that they preyed on victims' investors' patriotism and they made misrepresentations about the military. The problem was, at trial, at the Holmes trial, they had played the actual words, Ms. Holmes' voice speaking to these investors, and she never said in that tape, we're using the tape on the battlefield. She talked about the potential. Investors could take away from that what they will, but she never says we're using the technology on the battlefield. The government had experience with that. Was there contemporaneous objection? There were arguments on rule of completeness and I think potential hearsay problems you raised, but I didn't see on the record an objection that, wait a minute, the recording says one thing and now you're trying to elicit testimony on something different. Yes, Your Honor, there were. And you have to understand the context, first of all, that the tape was played, the judge said right before the witness testified that he had gone back and reviewed the tape and the transcript, the government knew what it said because they had been basically burned with it because it didn't work out the way they wanted to with the Holmes case. Everyone understood what this tape was about and we were arguing to the court, you have to let the jury hear the actual words. And it's extraordinary, Your Honor, in a fraud case to not, for the government not to want to have the jury hear the actual words that are supposedly the misrepresentations. So we did object. But in addition, Your Honor, even if this court will look at it under plain error review, I would point the case to the Alley case, which is cited in the briefs. Big difference there is that in the Alley case, which was a plain error case, the government never tried to capitalize on the false testimony. It backed way off, didn't argue it. But I counted 15 times that they not only used the misrepresentations about the military as a major theme, but then they also used it to buttress all of the investor witnesses' testimony to say, see, they're all saying the same thing. You could believe it because Mr. Tolbert and the other witness, Mr. Lucas, heard this tape. I just was looking at this statement, I believe is the one you're referencing, where Ms. Holmes says, we have been doing a lot of work for Special Operations Command in the context of missions in remote areas, where not only is there no capability to do testing for certain things that need to be measured, but if situations arise, what does, I mean, what is, you sort of said, well, you could reach any conclusion, the investors, what are you supposed to reach from this statement of we have been doing a lot of work for Special Operations Command? Was that true or not? It was true, Your Honor. In fact, the statement on the tape was almost identical to the statement that was made by Theranos when it corresponded with the military. So the military knew that same thing, and that's at ER-5345. So that project scope, and we're doing a lot of work with the military, that was true. And if you look at ER-5345, I think you'll see that. So there's also a statement in that, on that tape, Your Honor, about pausing the military work, and then it talks about the ability to take the technology and then the potential. But to look at it from a different perspective, Your Honor, the government clearly thought there was a difference, because in a fraud case, every single time, the government's going to play the tape. When they have a tape and it's the words that are supposedly wrong and fraudulent, they're going to play the tape. And the government did that. At the Holmes case, it was Government Exhibit A. The problem was, defense counsel got up and said, well, let's look at the actual words. And the jury hung on those counts, the Tolbert count and the Lucas count. So the NAPIU test is about could the outcome have been different. Let me ask you this, counsel. You didn't get to play the tape, but were you in other ways limited in your ability to cross-examine as to the actual statements, to the extent that there was some confusion? Okay. Well, was this the December 2013 call? Was it some other call? Because Lucas, in particular, was in regular contact with Holmes, and so she was giving him various updates. So to the extent there's any confusion in the government's direct examination, you could have cleared it up on cross. Right. No, Your Honor. And that was in Ali. That was why the court didn't reverse in Ali, because the defense was allowed to do some things. Here, we were not allowed to do that. What happened here, and it really starts at page ER-326 of the record, and it's about 30 or so pages after that where this argument is being made in the morning and then in the afternoon before the witness, Mr. Tolbert, testified. And what's going on here is that the court says at ER-356, you're seeking to introduce the tapes. You would like to get the tapes in in your cross-examination. And then he says, I would indicate, as the record is right now, I would not permit it. Let me just indicate that. Let me just indicate that. And then defense counsel, actually me, starts to make an additional argument about this point, and the judge very sternly said he wasn't interested in hearing any more argument about this point. And then when you read that argument starting on page ER-326, you see that counsel arguing the point was talking about using the tape in cross-examination, and the judge's answer at page 359. But that's what I said. Maybe I didn't make my question clear. I read that portion of the transcript. I know the district court didn't allow you to utilize the tape, but did he in other ways restrict your ability to cross-examine based on the content of that? Your Honor, we wanted the jury to hear the actual words, and the only way to do that was to put the transcript or the tape in front of the jury, and the judge said no. As we understood it, and I think fairly read, at ER-359, the judge said he was not going to allow it. He wouldn't let any further argument be entertained. And so then we had to do the best we can, but we weren't going to be allowed to show the jury the actual words. The government fought tooth and nail. And to go to Judge Nelson's question, when the government fights this hard to not play a tape of a co-conspirator's statements, I think that's all you need to know to realize it is very different from what's on the tape. It deprived the jury of the ability to make that decision. It had that ability in the Holmes case, and it hung, the jury was hung on those counts. And so we know the outcome. How often do you have a test jury where you know what would have happened? And here we have that, where the outcome most surely not only could have been different, but I think would have been different if the government, now the really outrageous thing, Your Honor, is not only did the government do this, where they didn't want the tape in, but then they argued this point over and over and over again at closing. It was a major theme of their closing argument to tie together why Theranos was so bad, and they were preying on victims' patriotism and so forth. So very different formality with the government backed way off, which is what you'd expect. In this case, the government went full bore on this false testimony that they knew was false because the tape was very much at issue in the Holmes case, and it was very much fought over in this case. What do you do? Is there a harmlessness analysis on this argument? There is not, Your Honor. This, by the way, goes to the investor counts, I should tell you. The other argument, constructive amendment, of course, goes to all counts. This would be — But we can't look in and say, was this harmless, this particular. I thought we could on this one. I didn't think we could on the first one, but I thought we could on this one. No, Your Honor. I think the standard is under NAPIU. Any reasonable likelihood that the false testimony could have affected the outcome. So in a sense, Your Honor, if the court were to conclude it couldn't have affected the outcome, impossible, I suppose there's your harmless error. It's not the same harmless error. Like for example, on the evidentiary questions, the government would have to show — Right. All the elements would have to be met. Our questions actually took you over time, but let me see if my colleagues have any additional questions. All right. Thank you very much, Counsel. Thank you. Let's hear from the government. Good morning, Your Honor. May it please the Court. Kelly Volkar on behalf of the United States. This Court should affirm Balwani's conviction and sentence because Balwani cannot show a constructive amendment occurred because there's no divergent between the essential elements that were alleged in the indictment, the unobjected to jury instructions, and the evidence that was presented to the grand jury, which matched the evidence that was presented at trial. Balwani was on fair notice of the government's theory long before trial began. And the most immediate to respond to my colleague across the aisle's argument is, I believe you heard him say over and over again, the government didn't know that the immediate jeopardy finding in the CMS report related to testing on a non-fair notice device, on a third-party device. That is simply wrong. And the Court can look to the grand jury transcript, which defense put into the record below and is at 2 S.E.R. 314 to 16. The government put the CMS report before the grand jury and asked the grand jury about the findings, including the voiding of the tests on all of the Theranos Edison's and PTINR run on the Siemens Advia. At prior points before the grand jury, the government had repeatedly noted that the Siemens Advia was a conventional third-party machine. This was not a secret. This was not confusing to the government. This was not confusing to the grand jury. What was presented to the grand jury is what was presented at trial, which is that the CMS report and specifically CMS inspector Sarah Bennett found systemic issues with Theranos's device, the Edison. In the CMS report, it's called the TPS 3.5. Can you explain to me how the CMS report could have concluded that if she, what I just heard I thought was that Sarah Bennett didn't have access to the Theranos device. She was only looking at the third-party devices. Yes, Your Honor. I believe that is a mischaracterization of the record. Sarah Bennett looked at the Theranos Edison device and Sarah Bennett looked at other testing as well. When my colleague across the aisle referred to proprietary technology, he was referring implicitly to the modified third-party devices, but he did not say that. And so, to Your Honor's point— Wait, hold on. Just so I'm clear. Sarah Bennett did not have access to the modified third-party devices, but did have access to Theranos proprietary technology? Your Honor, if I may, Sarah Bennett had access to everything. However, she ran the inspection with a partner whose name was Gary Yamamoto. They split up the review of the Theranos lab, as came out during her testimony. Sarah Bennett was in charge of reviewing the Theranos Edison device, the actual box that Theranos manufactured, and she also reviewed some other aspects of the lab as well. Gary Yamamoto was, if my memory serves, he did not testify at trial, but he was the person reviewing Theranos's modifications to third-party devices so that they could receive small samples. Would you—let's just assume that Sarah Bennett had not looked at Theranos proprietary information devices. Would you come to a different conclusion on this issue, or would you be making the same argument that they still had notice of everything? Your Honor, for the constructive amendment point, I believe that, at the end of the day, calling across the aisle is challenging three pieces of evidentiary evidence that were admitted at trial, the CMS report and Bennett's accompanying testimony, and two patients. And I would argue that the elements didn't change and the facts didn't change between the grand jury and trial, and therefore there can be no constructive amendment. And the reason I say that is because the indictment alleges two schemes to defraud. The scheme to defraud investors very much centered around which device was used. Investors invested in this company because they believed Theranos had manufactured a device that could run any blood test on a small device about the size of a portable printer. However, in reality, Theranos was running the vast majority of its patient testing on third-party devices that any lab could purchase off the shelf. However, in the indictment, the second scheme to defraud for patients, that centered much more on the blood testing services, and that's because, as I mentioned earlier, accuracy and reliability is what was paramount to the patient counts. The patients just cared about getting an accurate blood test. They didn't necessarily care or even know which device it was being tested on. And so that's where, and the Bill of Particulars really walks through this in spades, and I'm happy to provide some examples. However, at the end of the day... Is it true that Bennett, the CMS, I hadn't picked up on this nuance, that the CMS report found danger to life based on the Siemens module, not based on the Theranos module? Or did I get confused by the opposing counsel's argument? Your Honor, the CMS report identified 121 pages worth of deficiencies in the laboratory, not all of them related to Theranos' device, and not all of them related to the assays that the government identified in its indictment. In fact, in the Holmes trial, pre-trial, Holmes moved to exclude portions of the CMS report that fell outside of the Bill of Particulars successfully. And that's why, in her trial, only a portion of the CMS report was admitted. Balwani did not raise that argument at his trial, and instead he just moved to exclude the CMS report whole cloth. But the CMS report, as I understand it, was on the overall operation of the lab. That's correct, Your Honor. Counsel, on the second issue, why did the government fight so hard to keep the tape out? It did create some confusions to which conversations Lucas, for example, was talking about. Thank you, Your Honor. On the recording issue, I first want to push back on the government, or on my colleague's characterization of the government's evidence. The government, at each trial, tried to put in the most direct evidence related to each defendant. And in this case, the government presented testimony of Patrick Mendenhall, who didn't testify in the Holmes case, and there's the email at 7SER160204, where Mendenhall describes a 45-minute conversation with Balwani, directly with Balwani, and all of the misrepresentations that Balwani told him during that call. Tolbert and Lucas never spoke to Balwani, never interacted with Balwani. Balwani was not on the conference call. And so, at trial, as often occurred in both trials, the defense went to admit a statement either of themselves or their co-defendant, which has mixed in some self-serving statements, and the government noted that there was not a hearsay exception. The district court, in the colloquy back and forth, asked repeatedly for a hearsay exception. The entire focus of the discussion was an evidentiary ruling at that moment. Now defense counsel is trying to shoehorn it into a false testimony claim, but that was not on anyone's mind at that moment in time when it was being discussed. It was simply whether or not, on an evidentiary basis, the tapes could or could not be played. But more importantly than that, as Your Honor, Judge Nguyen pointed out to my colleague, after that initial discussion at the beginning of the day and right before the witness testified, Balwani dropped the matter. Balwani changed trial tactics in that moment, as litigants do. Balwani chose not to cross- His hands weren't otherwise tied in other ways during cross-examination of these two witnesses? No, Your Honor. In fact, Balwani, the last thing that Judge Davila said was, I'm not sure if that was a request to admit it or not, but I would like to indicate at this time I've not heard a hearsay exception and I do not see an opportunity to admit it. That did not preclude defense counsel from seeking to admit it after, for example, the witness testified on direct, if anything had changed. But that's not what defense counsel did. Defense counsel noted that there was a recording, noted that the defendant could not remember it word for word, did not seek to refresh the witness's recollection with the actual transcript of the recording, or even attempt to impeach him. In fact, defense counsel did not ask Tolbert about the military misrepresentation at all. There is not a single question in the cross-examination of Tolbert about what he heard about the military from Ms. Holmes. And in closing argument, we know why. Here before the appellate court, we know why. In closing argument, my colleague across the aisle repeatedly folded this into the theme of their case that they had already previewed in opening, that the government was hiding evidence from the jury. They were, the main theme of that in opening was the LIS database, and they just added the fact that the government had, knew of this recording but did not play it for the jury into that theme for closing, and repeated it over and over and over again. Why doesn't the government want you to hear what Ms. Holmes had to say? The government is providing you with an incomplete picture. The defense counsel chose to use the absence of this tape to their advantage, and then, and criticize the government for not playing Holmes' actual words. And because of that, Your Honor, I think that this certainly doesn't meet the plain error standard and it cannot be material to the ultimate verdict of the jury. Thank you. I would like to address counsel's point that the government repeated the point over and over at closing. Your Honors have likely read the closing argument, and I believe the record will show that while the government did reference Tolbert and the fact that he spoke only with Ms. Holmes, and that he did mention this point about the military, what my colleague is referencing is the number of times the government spoke about the misrepresentation that Ms. Holmes made about the military, writ large, and that is a larger category. And the most obvious evidence of that is Ms. Holmes said similar statements to PFM and counts. So while my colleague makes a big deal about the jury hung on certain counts related to Tolbert and Lucas, in her trial, the jury heard the recording and still convicted on other investor counts. And the last point that I will make is the Holmes jury also hung on Eisenman, count three, who was in that same group of investors but did not hear the call. However, in Balwani's case, Mendenhall, that email I mentioned a moment ago, investor Mendenhall, forwarded Balwani's false misrepresentations to Eisenman, to count three, the only one of that group of three that actually had any interactions directly with Balwani. You're free to cede the rest of your time unless you have additional points to make. If the court has no further questions, the United States asks that this court affirm. Thank you. Thank you. Thank you very much, both sides, for your argument today. They were very helpful. The matter is submitted and the decision will be issued in due course. The third case for the day, you were actually over time, but did you want to do rebuttal? Yes. Let's put a few minutes back on the clock. Thank you, Your Honor. I really appreciate that. Okay. Thank you, Your Honor. First of all, to answer Judge Nelson's question, Ms. Bennett did not inspect the part of the lab that had proprietary technology. You can see that at our opening brief at page 12. Neither her nor Yamamoto did either? Her colleague, Mr. Yamamoto, did, but the government didn't call him. My point was, Your Honor, they called the witness who didn't even inspect that part of the lab. The CMS report came in. Just so I'm clear, the CMS report, and I think Judge Schroeder clarified this in her question already, but the CMS report covered deficiencies across the board. It was not limited solely to non-Theranos proprietary. Ninety percent of it, Your Honor, was about conventional technology issues. Ninety percent. We had proposed during the motion to eliminate stage a redacted version that took out all the conventional technology evidence. The court rejected that. And if you look at our opening brief at page 12, Your Honor, you'll see that the immediate jeopardy point, which was the issue that dealt with patient health and safety and possible death, that was all about PTINR, which was a conventional technology test. And in terms of the government's argument about the grand jury, yes, they did present this CMS report to the grand jury. Not once, when you read that grand jury record, did the government ever tell the grand jury that it had anything to do with Theranos use of conventional technology. The grand jury would have no way to use that. And then, in addition, Your Honor, when you look at the full record here, you see that over and over again, the government thought that tests like HIV, in particular, were on Theranos technology when they actually weren't. They presented to the grand jury an R&D, research and development report, that was never used clinically. They admitted at page 6908 of the record and 6926 that the HIV test, they thought, was on a Theranos analyzer, a Theranos device. And they repeatedly, they had an expert named Dr. Master, who this Court has heard about, where Dr. Master was told that he should look at the HIV test on Theranos proprietary technology. It was just an error. So the government didn't know that. The grand jury had no way of knowing this was about conventional tech. The defense had no way of knowing. The government admitted it. The district court admitted it. The bill, in particular, is when you really read it at SCR 201 at SEC, you will see that it's all about Theranos technology, Theranos devices. That's what this case is about. This is a constructive amendment. Your Honor, I would urge the Court to reverse Mr. Bowen's convictions and remand for a new trial. Thank you very much, Counsel. Now the matter is submitted.
judges: SCHROEDER, NGUYEN, NELSON